IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2011

IN RE BARON H.S.M.

Appeal from the Chancery Court for Hawkins County
No. A-414      Thomas R. Frierson, II, Chancellor

No. E-2011-00043-COA-R3-PT-FILED-AUGUST 19, 2011

This is a termination of parental rights case regarding Baron H.S.M. ("the Child"), the son
of Sandra M. ("Mother").  Mother maintained a long-term relationship with Ray C., before
and since the Child's birth.  She contends that Ray is the Child's biological father.[1]  Mother
was incarcerated when the Child was born.  She arranged to transfer the Child to the care of
Ray's sister, Peggy V. and her husband, Ronald V. (collectively, "the Guardians").  Over two
years after they took custody, the Guardians filed a petition to terminate Mother's parental
rights and adopt the Child.  After a bench trial, the court terminated Mother's rights upon
finding, by clear and convincing evidence, (1) that Mother had abandoned the Child by
willfully failing to visit or support him and (2) that termination is in the Child's best interest.
Mother appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL
SWINEY and JOHN W. MCCLARTY, JJ., joined.

Jefferson B. Fairchild, Rogersville, Tennessee, for the appellant, Sandra M.

Daniel G. Boyd, Rogersville, Tennessee, for the appellees, Peggy V. and Ronald V.

---

[1]The record before us reflects that Ray is not listed on the putative father registry and has taken no
formal steps to establish that he is the biological father of the Child.  As a result, we decline to refer to him
as the Child's "father."  Ray was not named in the adoption petition and was not a party in the proceedings
below.  It goes without saying that he is not a party to this appeal.  We refer to him only as is necessary to
state the relevant facts.

**OPINION**

I.

The Guardians filed their adoption petition in January 2010, and a bench trial was held on September 28, 2010. We briefly summarize the proof below.

The Child was born on May 9, 2007. At that time, Mother was incarcerated in a federal prison in Texas as a result of her November 2006 convictions for social security fraud and unlawful conversion of funds. She was sentenced to thirty-six months and began serving her sentence in January 2010. Mother learned that she was pregnant before she reported to prison and arranged for Peggy and Ronald to become the Child's guardians and care for him while she was incarcerated. The parties did not discuss Mother giving up her parental rights or adoption. Just after the Child's birth, the Guardians flew to Texas where they picked up the newborn from the hospital. They returned to their home in Church Hill, Tennessee, where the Child has remained ever since.

The Child lives with the Guardians in a four-bedroom house. Ronald has worked for Eastman Chemical for the past 30 years and earns about $50,000 annually. Peggy explained that she had known Mother for over 20 years, and that Mother was engaged to marry Ray, who is her brother. Peggy denied knowledge as to whether Ray was the Child's natural father and said she had never referred to him as such. In July 2007, the Guardians sought and obtained legal custody of the Child primarily so they could include him under their health insurance coverage. Until he was four months old, the Child had experienced seizures and was once hospitalized for treatment. Other than the seizures, the Child was healthy and progressing normally.

By all accounts, the Guardians have met all of the Child's needs and the three share a close bond. Peggy considers the Child to be hers. Ronald agreed, and observed, "we went to the hospital and picked him up and took him home. He's just like our boy." At the time of trial, Peggy was 56, Ronald was 58, and the Child was 3. Ronald has a hearing problem, but, other than that, both of the Guardians are generally in good health.

Mother completed her sentence in August 2009 and visited the Child within a few days of her release. Thereafter, she called several times, but, according to Peggy, failed to show up for the visits that the parties had discussed. Mother next saw the Child on December 27 to celebrate Christmas and deliver presents to him. Ronald added that they once ran into Mother at a flea market in October 2009 and that she saw the Child then for "about five minutes." Peggy recalled that during her first visit, Mother commented that she could see the Child was well-cared for and she had no intention of removing him from the

Guardians' custody. There was no dispute that Mother never paid child support to the Guardians or purchased any necessities for the Child. Mother testified, however, that she had offered to do so, but that Peggy told her the Child did not need anything. While Peggy agreed that she had never requested child support from Mother, she denied that Mother ever offered to provide support and she further denied that she had advised Mother they did not need her help.

Mother grew up in Kingsport and returned there after her release from prison to live with Ray in his house. She and Ray had been in a relationship for most of the past 21 years and planned to marry at the end of the year.[2] In addition to the Child, Mother had three other sons, ages 22, 21, and 6. Before entering prison, Mother was involved in an automobile accident that lead to her taking prescription pain medications and she ultimately became addicted to hydrocodone. During her time in prison, she was treated with low doses of methadone and explained this was the reason the Child was born with that drug in his system. Mother denied that she currently had a drug problem; she noted she was on probation and had passed all her random drug screens since her release. Mother acknowledged that she had approached the Guardians and asked them to help with the Child while she was incarcerated. She explained that she had not asked Ray, "being the Child's father," to take care of the Child because he was already caring for her other young son, then 3 years old. She said that if she had known the Guardians were going to file an adoption proceeding, she never would have asked them for help. At the same time, Mother said that Peggy was "family," she's "wonderful," and she could not think of anyone better to care for the Child.

Mother said she had fully intended to take the Child back once she was released, but wanted to do it slowly "and do it the right way so nobody got hurt." She estimated that after being released from prison, she saw the Child "at least twice a month," but could not recall dates other than a visit at Thanksgiving and another after Christmas. Mother said that her efforts to visit more were sometimes hampered by her lack of transportation; she was not able to drive, did not have a car, and had to rely on Ray and work around his schedule before she could plan a visit. According to Mother, the Guardians had never told her she could not visit, but often gave her excuses for why certain dates or times were not convenient and this compounded her difficulty in arranging visits. Mother added that she believed the Guardians had changed their home phone number because "unavailable" was displayed when they called her. Mother said after her Thanksgiving visit, she saw a text message on Ray's phone from Peggy advising him that if Mother wanted to visit the Child again, she would need to get an attorney and take them to court.

---

[2]In her brief, Mother states that she and Ray are now married.

Mother stated that at one point, Peggy called her and told her she did not want to continue caring for the Child all the while knowing that one day Mother could take him from them. According to Mother, Peggy told her to make arrangements to take back custody of the Child, but later that evening, called back and said she had changed her mind. Mother conceded that she had never paid child support, but claimed that, despite her lack of income, she had nevertheless offered to make payments or buy things the Child might need. Peggy disputed each of these assertions.

At the time of trial, Mother was self-employed; she ran a cleaning business and earned $200-$500 a week. She felt she could support the Child and had a "beautiful" bedroom ready for him. She said she and Ray had a stable relationship and he was the family's breadwinner. Mother offered that the only reason she did not seek court-ordered visitation was her inability to find an attorney who would accept payments to take her case.

Ray asserted that he was the Child's biological father and that he wanted the Child to live with him and Mother but that he wanted the Child to maintain contact with the Guardians. Regarding visits with the Child, Ray said he went with Mother "a couple times a month or something like that," but she went by herself "a little more often." Ray conceded, without further elaboration, that he had taken no formal steps, including DNA testing, to be legally declared the Child's father.

Following the hearing, the trial court found, by clear and convincing evidence, that Mother had abandoned the Child by willfully failing to support him and by willfully failing to visit or engage in more than token visitation in the four months immediately preceding the filing of the adoption petition. *See* Tenn. Code Ann. § 36-1-102(1)(B), (C), (D) and (E) (2010). After further finding that there was clear and convincing evidence showing that termination of Mother's rights is in the best interest of the Child, the court terminated Mother's rights.

Mother timely filed a notice of appeal.

II.

Mother raises the following issues for our review:

> 1. Whether the trial court erred when it found clear and convincing evidence that Mother abandoned the Child by willfully failing to visit or financially support the Child during the four month period immediately preceding the filing of the petition for adoption.

-4-

2. Whether the trial court erred when it found clear and convincing evidence that it is in the best interest of the Child to terminate [Mother's] parental rights.

III.

Our review of this non-jury case is *de novo*. The trial court's findings of fact, however, come to us with a presumption of correctness that we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). No presumption of correctness attaches to the trial court's conclusions of law. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002); *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated under appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon a finding by the court (1) "that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." Tenn. Code Ann. § 36-1-113(c)(2010); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

On our review, we proceed mindful of our duty "to determine whether the trial court's findings, made under this clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d at 530.

IV.

A.

Mother challenges the trial court's findings that she abandoned the Child by willfully failing to visit or support him in the four months immediately prior to the filing of the adoption petition. We address these alternative forms of abandonment, mindful that "[t]he existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights." *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000)(*abrogated on other grounds*, *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005)).

The trial court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113 (g). That section provides in relevant part as follows:

> Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

As relevant to the present case, Tenn. Code Ann. § 36-1-102, referenced in subsection (g)(1) above, provides for the termination of parental rights on the ground of abandonment as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> *   *   *
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully

failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

* * *

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;

(E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

*See* Tenn. Code Ann. § 36-1-102(1)(A)(i), (C),(D),(E). For purposes of establishing either form of abandonment – the failure to visit or to provide child support – the relevant four-month period in this case is September 15, 2009 through January 15, 2010, the date the adoption petition was filed.

B.

The trial court found that there was clear and convincing proof to establish that Mother abandoned the Child by failing to visit him. The trial court set out its findings as follows:

The evidence is clear and convincing that for the period of four months immediately preceding the filing of the instant petition, [Mother] willfully failed to visit or engage in more than token visitation with the [C]hild. During the period of September 15,

2009 through January 15, 2010, [Mother] exercised only sporadic and infrequent visits with the [C]hild. [Mother] asserts that her failure to visit more often was due in part to her inability to secure proper transportation from Kingsport to Church Hill, Tennessee. Her transportation needs for the few visits made were primarily met by [Ray]. [Mother] also claims that [the Guardians] denied certain of her requests to visit with the [C]hild. [Mother] asserts that on several occasions [the Guardians] provided excuses for the [C]hild's unavailability or that attempted phone contact was unsuccessful. The [Guardians] denied thwarting her requests for visitation. The evidence does not establish that [the Guardians] engaged in a significant restrain of or interference with [Mother's] effort to develop a relationship with the [C]hild.

Mother contends that the only "proof" of her alleged lack of visitation was the testimony of the Guardians, which, she asserts, was directly contradicted by her own testimony and that of her witness Ray. She seemingly suggests that such disputed testimony is not enough to support the termination of her parental rights. We disagree.

At trial, the court heard from both Peggy and Mother regarding the subject of Mother's visits with the Child. Peggy testified with reference to a record she had kept of Mother's visits and phone calls because she "knew this was going to happen." According to Peggy's notations, Mother visited the Child a total of two times – in August following her release and again just after Christmas in 2009; thus, Mother visited only once in the four-month period that began in September 2009.

Mother, on the other hand, testified that she visited much more consistently but, for the most part, was unable to offer any dates or significant details. On direct examination, Mother testified as follows:

> Q: From August of 2009 when you were released up until January 15th when this Petition was filed, how often would you see or how often did you see [the Child], visit with him?
>
> A: I tried on a regular basis. I seen (sic) him at least twice a month, at least. When I first got out, I went - - I even saw [the Child] on a furlough . . . .
>
> Q: When was that?

-8-

A: That was while I was still incarcerated.

* * *

Q: Okay. Back to the time period from the time you were released until January 15th of this year. How often would you visit with [the Child]?

* * *

A: I visited him at least twice a month. A couple of times with Ray. A few times that I went on my own.

Q: Okay. [C]an you recall any specific days or holidays that you spent with [the Child]?

A: I remember specifically the Saturday after Thanksgiving.

* * *

Saturday my family had a family supper. After that my sister drove me to Peggy's so I could visit with him for the holiday . . . .

* * *

Christmas I'm definite about. We went there, gave him gifts. We was (sic) there at least two hours.

* * *

Q: All right. You've mentioned Thanksgiving, which is November, and Christmas, which is December. What about, did you have visitation with [the Child] in October or September?

A: Yes. I visited with him, and I wish I could remember the exact dates, but I can't. But I know for a fact I've seen my child every single - - every time I would get a chance. I don't have a car. I could not drive at that moment, at that time. I had to rely

-9-

on Ray to get me. Sometimes he works 12, 15 hours a day. When he comes home, I'm like, "Will you take me to see the [Child]?" He's like, "Well, wait till this weekend," or, you know, then the weekend would show up, and somebody would always have something to do. One day I almost started walking to the [Child's] house.

In the face of such testimony, the trial court credited the testimony of Peggy over Mother's. On our review, we conclude that the evidence does not preponderate against the court's finding that Mother willfully failed to visit the Child during the relevant time period. In short, even giving Mother "credit" for the Thanksgiving visit, which Peggy disputed, two visits in four months does not establish a significant, meaningful pattern of spending time with one's child. Moreover, as previously noted, we review a trial court's determinations of witness credibility with great deference and will not re-evaluate a trial judge's determinations on the subject unless they are contradicted by clear and convincing evidence. ***Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999). In the present case, Mother's bald, conclusory statements fail to establish that she engaged in anything more than a few token visits with Child.

C.

With respect to child support, Mother admits that she provided none. The gist of her argument is that her deficiency in this regard was not willful. Mother testified regarding her lack of income and efforts to support the Child as follows:

> Q: Have you had conversation with [Peggy] regarding the support of this [C]hild?
>
> A: Asking, "Have you needed anything" Can I help in any way?" You know, other than that, no. I never said, "Peggy, is there a set fee you want me to pay you?" I just - - my stupidity. I took it for granted that he didn't need anything. I should not have done that.
>
> * * *
>
> Q: Did you ever offer to pay her?
>
> A: Yeah. I did offer. At that time I wasn't employed. So I would ask . . . Ray, because he gave them money for a washer

and dryer that he had gotten them. So I just thought . . . if they needed money, they would have said, "Give me more money."

Q: [Y]ou said you had offered to pay child support. Can you give more detail to that?

\* \* \*

A: I just offered to buy things that he needed. [B]ecause I have a church, and they would have helped me. I wasn't employed at the time. So I would have asked the pastor or one of my fellow church people, and they would have . . . helped me obtain it if he had ever needed anything.

\* \* \*

She would tell me no, that he was very well cared for and he didn't need for anything.

Mother further testified that, although she was unemployed and had no means of providing "cash," she had "offered financial support to [the Guardians] anyway on more than one occasion" that they had refused. Peggy denied that Mother ever paid or offered to pay child support, or that she, Peggy, had ever refused any such offer.

The trial court found the ground of abandonment by non-support as follows:

> The evidence is clear and convincing that during the four month period preceding the filing of the instant petition, [Mother] willfully failed to support or make reasonable payments toward the support of [the Child]. No evidence was presented that during this time [Mother] was incapable of being gainfully employed and earning income. Tennessee courts have recognized that "the support of one's children should not be conditioned upon whether one has been placed under a court order to do so,". . . . This Court accordingly determines that by reason of [Mother's] willful failure to pay or provide child support for the minor [C]hild during the relevant time period, she has abandoned the minor [C]hild for purposes of termination of her parental rights.

-11-

Again, the evidence does not preponderate against the trial court's findings. Mother admittedly neither paid nor provided any support for the Child and offered no credible reason for failing to do so. As a result, we must agree that her decision to provide no support to the Child was willful. Regarding the concept of willfulness in a termination case, this Court has observed:

> The question of intent or willfulness is fact specific and depends on the totality of circumstances. Failure to provide support is willful if the parent is aware of his or her duty to support, is capable of paying support, makes no attempt to provide support, and has no justifiable excuse. Willful conduct is intentional or voluntary; often, intent must be inferred from circumstantial evidence. Willfulness is a question of fact that the trial court is in the best position to make.

*In re W.B.*, Nos. M2004-00999-COA-R3-PT and M2004-01572-COA-R3-PT, 2005 WL 1021618 at *8-9 (Tenn. Ct. App. M.S., filed April 29, 2005) (internal citations omitted). As the trial court observed, Mother wholly failed to address her lack of employment or any efforts at earning an income during the four months in question. There is no indication that she made any efforts to work to support the Child until she started an apparently successful cleaning business some six months after her release. By then, the adoption petition was pending. Further, Mother indicated she had sources, including Ray, that could have helped her, but she failed to act based on her mistaken assessment that the Guardians would have asked for money if the Child needed anything. We conclude that the evidence does not preponderate against the trial court's judgment that there is clear and convincing evidence that Mother's parental rights should be terminated for willfully failing to support the Child.

V.

Lastly, we consider whether there was clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights is in the best interest of the

Child. To this end, we are guided by the list of non-exclusive factors provided in Tenn. Code Ann. § 36-1-113.[3]

---

[3]Tenn. Code Ann. § 36-1-113(I) provides as follows:
> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In support of its termination order, the trial court set forth its best-interest finding as follows:

> In determining whether termination of parental rights is in the best interest of the child, this Court determines that as of the filing of this action, [Mother] did not make such an adjustment of circumstances or conditions as to make it in the [C]hild's best interest to reside in her home. A present, meaningful relationship between [Mother] and the [C]hild has not been shown.
>
> Following her release from prison, [Mother] did not maintain regular visitation or contact with the [C]hild and did not provide support for the benefit of the [C]hild. The evidence further supports a finding that a change of caregivers and physical home environment of the minor [C]hild is likely to have an adverse effect on the [C]hild's emotional well being. The [C]hild appears to have bonded closely with [the Guardians]. The physical environment of [the Guardians'] home appears to be healthy and safe. There does not appear to be any history of criminal activity in the [Guardians'] home.

The trial court further cited statements by of the guardian ad litem to the effect that the Child "appears to be a normal, happy, rambunctious child," was "well-adjusted," and had his needs adequately provided for by the Guardians. Mother does not dispute these descriptions of the Child and his circumstances, but insists that the trial court erred in ultimately going against the "recommendation" of the guardian ad litem to return the Child to her.

Essentially, following interviews with the parties at their respective homes, the guardian ad litem concluded that the Child was happy and developing normally despite "his rather difficult start in life." Further, the guardian ad litem acknowledged that the Child lived comfortably with the Guardians who were financially secure. With respect to Mother, the guardian ad litem noted that Mother lived in a "roomy" house together with Ray and her three sons and also appeared to have less, but still sufficient, financial resources to support the Child. The guardian ad litem further noted Mother's history of prescription drug addiction, her criminal history, and recent, undetermined "legal issues." In concluding his report, the guardian ad litem recommended that the Child be returned to Mother's custody "*if [Mother] can verify that she has satisfactorily resolved her substance abuse and legal difficulties. . . .*" (Emphasis added). As we have discussed, the proof at trial did not confirm

that either issue had been resolved – Mother's own, uncorroborated testimony that she no longer had a drug problem and had passed random drug screens since her release  was the only evidence that her addiction was under control.  Mother remains on probation.  Mother also acknowledged that her 21-year-old son, whom the guardian ad litem indicated was living with Mother (which Mother denied at trial), had various drug-related charges pending at the time of the trial. Lastly, the driver's license of Mother had been suspended in a case that was pending, she says, as a result of someone stealing her identify and committing an offense while Mother was incarcerated.

As this Court has observed, the determination of best interest should be considered from the perspective of the child and not the parent.  *In re Giorgianna H.*, 205 S.W.3d 508, 523 (Tenn. Ct. App. 2006) (citations omitted).  On our review of the entire record, we conclude that the evidence does not preponderate against the trial court's best-interest determination.  The Child was raised by the Guardians since birth, and they willingly cared for him at Mother's request while she was absent for nearly three years because of her criminal misconduct.  On her release, Mother immediately visited the Child, but then failed to establish a meaningful parent/child relationship by failing to maintain contact with him and never providing any support.  All the while, the Child lived with the only "parents" he has ever known.  The Guardians, the guardian ad litem, and even Mother and Ray indicated that the Child was happy, healthy and living comfortably with the Guardians.  Certainly, the evidence supports the trial court's finding that uprooting the Child and placing him in the custody of the biological mother who was essentially a stranger to him would have been detrimental to his well-being.  Based on the foregoing, we conclude that the evidence does not preponderate against the trial court's finding that there is clear and convincing evidence showing that the termination of Mother's parental rights is in the best interest of the Child.

VI.

The judgment of the trial court is affirmed.  Costs on appeal are taxed to the appellant, Sandra M.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE